UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| **Boguslaw Bosak and Barbara Bosak,**<br><br>Plaintiffs<br><br>v.<br><br>**West Bend Mutual Insurance Company,**<br><br>Defendant. | Case No.<br><br>**JURY TRIAL DEMANDED** |

# COMPLAINT

Plaintiffs, Boguslaw Bosak and Barbara Bosak ("Plaintiffs" or the "Bosaks"), by and through their attorneys, Jaszczuk P.C., bring this Complaint for Declaratory Judgment, Breach of Contract, and Bad Faith against the Defendant West Bend Mutual Insurance Company ("Defendant" or "West Bend"), and in support thereof, allege as follows:

## PARTIES

1. Plaintiffs, Boguslaw and Barbara Bosak, are individuals who reside in and are citizens of the State of Illinois.

2. Defendant West Bend Mutual Insurance Company is a Wisconsin insurance company with its principal place of business in Wisconsin.

## JURISDICTION AND VENUE

3. The Court has subject matter jurisdiction over this matter under 28 U.S.C. 1332(a)(1), because this matter involves citizens of different states and the amount in controversy exceeds $75,000.

4. The Court has personal jurisdiction over Defendant because Defendant's principal place of business is in Wisconsin and Defendant conducts substantial business activities in Wisconsin and within this District.

5. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District. Specifically, the property in question is located in this District and Defendant's coverage decisions were made in this District.

## FACTUAL BACKGROUND

6. On March 11, 2023, the Bosaks purchased an insurance policy (Policy No. HHD 8461062-00) from West Bend providing coverage for their property located at 39334 Bloomfield Rd. in Burlington, Wisconsin (the "Property") for the period March 11, 2023 through March 11, 2024 (Exhibit A).

7. On April 4, 2023, a major storm rolled through Burlington and caused significant wind and hail damage to the Bosaks' Property.

8. On January 9, 2024, the Bosaks made a claim (Claim No. AR10265) (the "Claim") with West Bend for the significant damage sustained to their Property.

9. West Bend assigned the claim to adjuster Jack Leibforth, a Senior Claims Representative for West Bend.

10. On January 10, 2024, Leibforth reached out to the Bosaks indicating that he had been assigned to adjust their claim.

11. Boguslaw, who was set to leave on a trip to Europe, asked his friend, Jonathan Tischel, to assist the Bosaks with the claim and to help move things forward in Boguslaw's absence.

12. Accordingly, on the same day, Boguslaw and Tischel telephoned Leibforth and left him a message.

13. Over the next several weeks, Tischel and Leibforth communicated a number of times over email.

14. But there was something peculiar about these communications. After a few back-and-forths, Tischel noticed that Leibforth kept repeatedly asking whether the Bosaks had retained a contractor. The communications from Leibforth included:

- January 11, 2024: "Are you working with a contractor?"

- January 29, 2024: "I was wondering whether I could inspect the Burlington WI. home on Thursday at like 1/130 with a contractor, any damages inside?"

- January 30, 2024: "Perfect would you like me to bring a contractor."

- February 1, 2024: "Do we need a contractor, please let me know"

- February 5, 2024: "Please let me know if we need a contractor or I will need to reschedule to get a ladder assist to help got [sic] on the roof for West bend."

15. On information and belief, Leibforth's repeated inquiries about a contractor were prompted by his desire to refer work to his friends and family and Leibforth subsequently became displeased when the Bosaks did not acquiesce to Leibforth's repeated attempts to refer the work to Leibforth's chosen contractors.

16. For weeks, Leibforth made little effort to inspect the damage.

17. Finally, on April 1, 2024, Leibforth sent his preferred inspector, Nederveld Engineering, to inspect the damage to the Property.

18. And then, once again, Leibforth went silent. Over the next few weeks, Boguslaw called Leibforth on several occasions, leaving a message each time, but received no response.

19. Frustrated with West Bend's delays, on April 22, 2024, Boguslaw wrote an email to Leibforth stating, in part: "I am trying to call you and leaving voicemails, I need to know what's going on with my claim. The engineer you hired came out on the 1st of April. I hoping I have some answers here."

20.     Finally, on April 23, 2024, Leibforth responded, and sent a letter to the Bosaks indicating that Nederveld Engineering completed its inspection of the property on April 12. That was not true, as the inspection had been completed on April 1.

21.     In his letter, Leibforth calculated the covered damages at $10,122.55 minus a $5,000 deductible, for a total payment to the Bosaks of $5,122.55. Leibforth noted that "during the inspection wear, tear, deterioration of the singled [sic] surfaces and cosmetic dents were documented to roof metals" and stated that coverage would be denied for "wear, tear, deterioration and cosmetic damage to roof metals."

22.     The Bosaks knew that, given the amount of visible damage (not attributable to wear, tear and deterioration), the figure calculated by West Bend was nowhere near the actual cost to repair the roof. Accordingly, they asked a trusted contractor to provide an estimate of the repair costs. That estimate came to $106,378.34.

23.     Given the wide disparity in estimates, on May 24, 2024, the Bosaks demanded an appraisal of the damage in question and nominated Allen Harris as an appraiser.

24.     On May 29, 2024, Leibforth sent a letter to the Bosaks acknowledging the request for appraisal and naming Mark Stromberger at MCS Property Claim Consulting as "our West bend [sic] appraiser." In the same letter, Leibforth demanded that the Bosaks submit a sworn proof of loss, which they did on May 31, 2024.

25.     As it turns out, the appointment of Mark Stromberg violated the provisions of the Policy.

26.     The Policy provides, in pertinent part:

E. Appraisal: If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent and *impartial* appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire

4

within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the "residence premises" is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss. (emphasis added)

27. But Stromberger turned out to be anything but an "impartial" appraiser.

28. Continuing Leibforth's precedent, Stromberger continually delayed and thwarted the adjustment process.

29. <u>First</u>, on information and belief, Stromberger's obstreperous conduct caused Alan Harris, the initial appraiser appointed by the Bosaks, to withdraw from the assignment. As a result, the Bosaks were forced to nominate a replacement appraiser, Ben Smith, on August 28, 2024.

30. <u>Second,</u> Stromberger, demonstrating his partiality, refused to personally inspect the damage to the Property.

31. For example, on October 7, 2024, Smith and Stromberger met to inspect the Property. Smith proceeded up a ladder to inspect the roof and immediately identified severe hail damage to the roof and siding on the steeper portion of the roof.

32. Smith called to Stromberger to show him the damage but—***incredibly***—Stromberger refused to proceed to the steeper portion of the roof to see the damage for himself.

33. Instead, Stromberger continued to minimize the damage—while having refused to view it for himself—thereby requiring the parties to submit the matter to an umpire.

34. <u>Third,</u> once the umpire was appointed, Stromberger continued to impede and thwart the process at every turn.

35. For instance, in June 2025, Smith attempted to schedule a Property inspection for Ben White, the neutral umpire chosen by the parties.

5

36. But Stromberger thwarted that effort, refusing to permit the umpire to inspect the Property, arguing that the inspection could only take place at a time when Stromberger could bring witnesses to the inspection.

37. This objection was nonsensical, as the umpire did not need any witnesses to determine the extent of the damage on the roof. Moreover, as an ostensibly neutral appraiser, Stromberger had no basis or reason to present witnesses to the umpire. And the appraisal provision of the policy in question did not contemplate either party bringing witnesses to an umpire's inspection of the subject property.

38. Not surprisingly, just like the first appraiser, soon thereafter the umpire also chose to withdraw from the assignment, on information and belief, as a result of Stromberger's conduct.

39. <u>Fourth</u>, after the withdrawal of the first umpire, Smith attempted to work with Stromberger to agree on an alternative umpire. But, once again, Stromberger continued his unreasonable conduct, putting forth only his own chosen candidates and refusing any neutral candidates.

40. After Stromberger's multiple refusals to agree to a neutral umpire, Smith suggested that the parties ask the American Arbitration Association to appoint a neutral umpire.

41. ***Incredibly***, Stromberger refused this idea as well, making it abundantly clear that he had no intention of ever permitting a neutral umpire to consider the claim.

42. The months continued to pass with little progress, as Stromberger, Leibforth and West Bend continued to delay the adjustment of the claim.

43. Frustrated with the continual delays, on June 11, 2025, Barbara sent an email to the broker (Patrick Cook), copying Leibforth, stating:

Our appraiser has informed us that West Bend's appraisers are delaying the whole claim process for our home at 39334 Bloomfield Rd. It has been 2 months of silence on their end and one whole year since this process has started and we are not getting any closer to resolving this claim. I have to say, I'm really disappointed at how West Bend is handling this. I urge you to personally contact the appraiser (also attached to this email) and get this taken care of as soon as possible without further delays. I would also like to get in contact with the district supervisor so I can inform him on what is going on with this claim and his appraisers. Please forward this information to me so I can call him directly.

44. The next day, the broker forwarded Leibforth's response to Barbara. Leibforth tried to blame the delay on a disagreement about the damage, indicating that he had seen no damage: "the disagreement here is me, our engineer and our appraiser did not see any damages [sic] to the roofs [sic], the insured, there [sic] Public adjuster and the engineer and appraiser believe there is damage." But, as described above, Leibforth had actually refused to view the damage for himself.

45. In the same email, Leibforth indicated that he would respond to Barbara and would even include his manager on the email: "I will respond to Mrs. Bosak and you and have my manager included in the email, so Mrs. Bosak has his information if she desires a contact, but he is quite aware of all that goes on in our files."

46. But, true to form, Leibforth did not send an email to Barbara and did not include his manager. Instead, Leibforth and West Bend continued to unreasonably delay the adjustment of the Bosaks' claim.

47. As a result, on August 5, 2025, Barbara sent another email to the broker about West Bend's continual delays and asked the broker to inquire about the claim: "Hello Patrick, Would you inquire about our claim in Wisconsin for me?? This is getting quite frustrating for me as you can imagine."

7

48. Later the same day, the broker forwarded Leibforth's response to Barbara, this time blaming the delay on the recusal of the first umpire: "Both appraisers (both sides) still trying to vet a few more umpires to see if anything to be agreed upon, if nothing soon, we will work to get a court appointed umpire. The big delay was the initial umpire decided after months to recuse himself and not let anyone know. They are also (both) appraisers trying to get the original umpire to agree on assignment."

49. Leibforth's explanation was wrong, as Leibforth and Stromberger had continually delayed the process and, on information and belief, the umpire's withdrawal was caused by Stromberger.

50. On August 26, 2025, after delaying the claim adjustment for more than 18 months, West Bend filed a complaint in the Circuit Court of Cook County, Illinois seeking the appointment of one of Leibforth's preferred umpires (the "Illinois Complaint").

51. Unfortunately, the Illinois Complaint simply reinforced West Bend's haphazard adjustment of the claim

52. To begin with, the complaint was demonstrably wrong as to the key allegations.

53. Specifically, West Bend alleged that the Bosak home in Park Ridge sustained hail damage, that the Bosaks made a claim for the damage sustained to their Park Ridge home, and that the parties dispute causation and amount of loss for the damage to their Park Ridge home.

54. All of that was wrong.

55. The Bosaks' home in Park Ridge did not sustain hail damage on April 4, 2023 and the Bosaks did not make a claim with West Bend for hail damage to their Park Ridge home.

56. Instead, the Bosaks made a claim relating to the damage sustained to their Burlington Property in Wisconsin.

8

57. After 18 months of claim adjustment, West Bend should have known this.

58. And West Bend cannot blame its outside counsel. Lawyers follow their clients' direction. As a result, it is irrelevant whether West Bend instructed its outside counsel to list the wrong property in the complaint or simply chose not to satisfy its duty to carefully review the complaint before filing it in court. Either scenario aptly demonstrates the care (or lack thereof) West Bend has shown in adjusting the Bosaks' claim.

59. Beyond the numerous obvious errors, a few months later, West Bend determined that it had filed the Illinois Complaint in the wrong jurisdiction—Illinois—and voluntarily dismissed the matter on November 26, 2025, indicating in its motion that the "Complaint should have been filed in the State of Wisconsin."

60. Nevertheless, to this day, almost a month later, West Bend has apparently still not filed the promised complaint (and has certainly not served it).

61. And, in a few weeks, two years will have passed since the Bosaks first made their claim.

62. It should not take 2+ years to adjust a hail damage claim. That is not how insurance is supposed to work.

63. Accordingly, based on West Bend's conduct, Boguslaw and Barbara Bosak bring this complaint for declaratory judgment, breach of contract, and bad faith.

**FIRST CAUSE OF ACTION**
DECLARATORY JUDGMENT

64. Boguslaw and Barbara Bosak repeat and reallege the allegations of paragraphs 1 through 63 as if fully set forth herein.

65. The Policy is an insurance contract under which the Bosaks paid premiums in exchange for West Bend's promise to timely and properly adjust and pay claims.

9

66.     Boguslaw and Barbara Bosak have complied with all applicable provisions of the Policy, including payment of premiums, in exchange for West Bend's duty to timely and properly adjust and pay claims, but West Bend has failed to fulfill its obligations under the terms of the Policy.

67.     To that end, West Bend wrongly cited "wear, tear, deterioration and cosmetic damage to roof metals," as a basis to deny coverage for the claim.

68.     But West Bend's basis for denial and failure to properly pay the claim was at the time and continues to be categorically wrong.

WHEREFORE, Boguslaw and Barbara Bosak seek a declaratory judgment finding that their claim is covered and that West Bend is required to pay the claim in full, as well as such other and further relief that this Court deems just.

## SECOND CAUSE OF ACTION
BREACH OF CONTRACT

69.     Boguslaw and Barbara Bosak repeat and reallege the allegations of paragraphs 1 through 63 as if fully set forth herein.

70.     The Policy is an insurance contract under which the Bosaks paid premiums in exchange for West Bend's promise to timely and properly adjust and pay claims.

71.     Boguslaw and Barbara Bosak have complied with all applicable provisions of the Policy, including payment of premiums, in exchange for West Bend's duty to timely and properly adjust and pay claims, but West Bend has failed to fulfill its obligations under the terms of the Policy.

72.     By failing to adjust the claim in a timely and proper manner, and by failing to properly pay the claim, West Bend breached its obligations under the Policy.

WHEREFORE, Boguslaw and Barbara Bosak seek an award of compensatory damages attributable to West Bend's breach of its duties, together with costs sustained herein.

### THIRD CAUSE OF ACTION
TORTIOUS BAD FAITH

73. Boguslaw and Barbara Bosak repeat and reallege the allegations of paragraphs 1 through 63 as if fully set forth herein.

74. At all times relevant to this Complaint, Wisconsin common law prohibited West Bend from acting in bad faith. *Anderson v. Continental Ins. Co.*, 85 Wis. 2d 675 (1978)

75. Specifically, under Wisconsin law bad faith is shown where an insurer does not have a reasonable basis for denying benefits of a policy and the insurer has knowledge or reckless disregard of the lack of a reasonable basis for denying the claim. *Id.* Further, punitive damages are appropriate upon a showing of (1) evil intent deserving of punishment or of something in the nature of special ill-will; (2) wanton disregard of duty; or (3) gross or outrageous conduct. *Id.*

76. Here, West Bend, displayed evil intent, special ill-will, wanton disregard of duty, gross conduct, and outrageous conduct by, *inter alia*, (1) delaying settlement of the claim, (2) attempting to steer work to the adjuster's preferred contractors, (3) failing to appoint an impartial appraiser, (4) causing the withdrawal of an appraiser and an umpire, (5) refusing to properly inspect the damage, (6) withholding permission for the umpire to inspect the Property, (7) thwarting the appointment of a neutral umpire, (8) bringing a lawsuit against the Bosaks relating to a property for which they never made a claim, and (9) refusing to pay the proper amount of loss.

77. Accordingly, the Bosaks are entitled to compensatory damages (including attorneys' fees), damages for emotional distress, and punitive damages.

11

WHEREFORE, Boguslaw and Barbara Bosak request compensatory damages, attorneys' fees, damages for emotional distress, and punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Boguslaw and Barbara Bosak respectfully request the following relief:

A. Judgment in favor of Boguslaw and Barbara Bosak and against West Bend;

B. An award of compensatory damages;

C. An award of damages for emotional distress;

D. An award of punitive damages;

E. An award of attorneys' fees and costs;

F. An award of prejudgment interest, to be calculated according to law; and

G. Such other relief as the Court deems just and equitable.

## JURY DEMAND

Boguslaw and Barbara Bosak demand a trial by jury of all claims in this complaint so triable.

Dated: December 23, 2025                     Respectfully Submitted,

By: */s/ Martin W. Jaszczuk*

Daniel I. Schlessinger (WIED Bar No. 3122102)
Martin W. Jaszczuk (WIED Bar No. 6277720)
Akshay Soman (WIED Bar No. 6347363)
**JASZCZUK P.C.**
311 South Wacker Drive, Suite 2150
Chicago, Illinois 60606
Tel: (312) 442-0509
dschlessinger@jaszczuk.com
mjaszczuk@jaszczuk.com
asoman@jaszczuk.com